E-FILED
Tuesday, 10 January, 2006  11:36:34 AM
Clerk, U.S. District Court, ILCD

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | |
|---|---|
| PHILLIP C. JOBE,           )<br>                            )<br>        Plaintiff,   )<br>                            )<br>   v.                       )<br>                            )<br>DONALD E. RAGER, individually,  )<br>and THE UNIVERSITY OF ILLINOIS, )<br>a public institution,       )<br>                            )<br>        Defendants.  )   | Case No. 03-1401 |

## O R D E R

This matter is now before the Court on Defendants' Motion for Summary Judgment. For the foregoing reasons, Defendant's Motion [#24] is GRANTED.

**FACTUAL BACKGROUND**

In January 1985, Plaintiff, Phillip C. Jobe ("Jobe"), was hired as a Professor of Pharmacology at the University of Illinois College of Medicine in Peoria, Illinois (UICOM-P). At that same time, he was appointed Chair of the Department of Biomedical and Therapeutic Sciences ("DBTS"). He served as Chair of DBTS until August 31, 2001, when Defendant Donald E. Rager ("Rager"), who became the Regional Dean at UICOM-P, did not reappoint him.

When Jobe came to UICOM-P in 1985, he developed a certain vision for the goals of the DBTS. Sometime time prior to 1989, he proposed and drafted a white paper outlining a plan for the development of biomedical research in "Downstate Illinois." That white paper, which was titled "Biomedical Research Should Become A Priority in Downstate Illinois," was endorsed by the UICOM-P Executive Committee in 1989. As a result, both

federal and state sources provided funds for the creation of a biomedical research center located at UICOM-P, under the direction of both UICOM-P and a private corporation, the Health Advance Institute ("HAI").  The project, which was premised upon receipt of matching funds, is referred to as the HAI/FDA project.

Much to Jobe's dismay, in the ensuing years, UICOM-P did not provide matching funds for the HAI/FDA project.  Rather, the University allocated funds for laboratory projects at UICOM-P to other purposes, such as classrooms and administrative space, which he contends was contrary to the terms of the grants.

Jobe complained about these perceived mistakes to then-Regional Dean, Michael Bailie ("Bailie"), and to the Dean of the University's four medical campuses, Gerald Moss ("Moss").  Jobe alleges that Bailie and Moss did not agree with his position on this issue and that they "prohibited him from discussing the University's diversion of capital funds from their promised uses with federal and state authorities or with Peoria community leaders." Response at 16.  Nevertheless, Jobe did comment on what he considered to be the University's failure to live up its obligations to the HAI/FDA project, etc.  Thereafter, the professional relationship between Jobe, Bailie, and Moss grew more strained and eventually disintegrated.

In 1999, Bailie was promoted to Interim Vice Dean for the University's four medical campuses.  This left open the position of Regional Dean for UICOM-P.  The Executive Committee for UICOM-P recommended Jobe as first choice for Interim Regional Dean. Nevertheless, the University eventually selected Defendant Rager as Regional Dean for UICOM-P.  According to Jobe, Rager was hired on the condition that, or, at least with the understanding that, he would fire Jobe from his tenured position as Professor of

Pharmacology. Further, according to Jobe, "Rager has undertaken a campaign of harassment toward Jobe with the purpose of silencing his voice in the University and forcing him from his professorship …" Response at 17. This claim is vigorously disputed by Defendants.

In the summer of 2000, UICOM-P began to recruit Dr. Jasti Rao, with the intent that he would join the DBTS and bring cancer biology research to the institution. Not surprisingly, Jobe disagreed with this decision, as well. Jobe vocally opposed bringing Dr. Rao into the DBTS, allocating space for his research, and the entire process that resulted in his being hired.

Needless to say, Jobe and Rager's relationship has been contentious. Jobe has complained about Rager's treatment of him within University processes, and on December 9, 2003, Jobe filed the present action, alleging that Rager did not reappoint him as chair of DBTS in August 2001, and committed other acts of sabotage against him, because he spoke out against what Jobe believed to be poor fiscal policies of UICOM-P in violation of the First and Fourteenth Amendment of the United States Constitution. Defendants have now moved for summary judgment. Jobe has filed his response, and this Order follows.

## LEGAL STANDARD

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party may

meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." Id. at 325. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. Celotex, 477 U.S. at 324. Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir. 1989). Summary judgment will be denied where a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995).

## DISCUSSION

### I.   FIRST AMENDMENT RETALIATION

It is axiomatic that the First Amendment protects an individual's right to freedom of expression. Individuals do not forfeit their First Amendment rights merely by virtue of the fact that they accept employment with a governmental unit or agency. Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 1734 (1968); Cygan v. Wisconsin Dept. of Corrections, 388 F.3d 1092, 1098 (7th Cir. 2004). In the specific context of academic institutions, "the First Amendment protects the right of faculty members to engage in

academic debates, pursuits, and inquiries and to discuss 'ideas, narratives, concepts, imagery, [and] opinions — scientific, political or aesthetic — [with] an audience whom the speaker seeks to inform, edify, or entertain." Trejo v. Shoben, 319 F.3d 878, 884 (7th Cir. 2003), *citing* Swank v. Smart, 898 F.2d 1247, 1251 (7th Cir. 1990).

That being said, "a public employee's freedom of speech on matters of public concern is far from absolute and all-encompassing, and the exercise of protected speech may nevertheless serve as the basis for termination if the employer articulates convincing reasons for taking such action." Id. at 885, *citing* Waters v. Churchill, 511 U.S. 661, 114 S.Ct. 1878 (1994). Consequently, "public employees do not have the unfettered right to express themselves on matters related to their official responsibilities, and courts must give due weight to the government's interest in efficient employment decisionmaking when evaluating First Amendment retaliation claims." Cygan, 388 F.3d at 1098. In other words, when evaluating the constitutional propriety of a restraint on government employee speech, courts must attempt to "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 88 S.Ct. at 1734-35; Wainscott v. Henry, 315 F.3d 844, 848 (7th Cir. 2003).

The Court applies a three-step analysis to Jobe's retaliation claim, asking: (1) whether the speech was constitutionally protected; (2) whether the Defendants' actions against him were motivated by the constitutionally protected speech; and (3) whether the Defendants can show that they would have taken the same action against him if he had not engaged in such speech. Lifton v. Bd. of Ed. of the City of Chicago, 416 F.3d 571, 575 (7th

Cir. 2005). The first two inquiries make up a plaintiff's prima facie retaliation case, and the third allows an employer to rebut that case by showing that it would have taken the adverse employment action regardless of the plaintiff's protected speech. Id. If the employer carries its burden in the third step of the analysis, then the burden shifts back to the plaintiff to show that the proffered reasons for the employment action were pretextual. Id.

### A. Was Jobe's Speech Constitutionally Protected?

In determining whether speech is considered protected speech under the First Amendment, courts apply the two-step Connick-Pickering test. Schad v. Jones, 415 F.3d 671, 674 (7th Cir. 2005) (citing Connick v. Myers, 461 U.S. 138 (1983)); Pickering v. Bd. of Ed. Of Township High Sch. Dist., 205, 391 U.S. 563 (1968). Under Connick, the Court first determines whether the employee spoke "as a citizen upon matters of public concern." Connick, 461 U.S. at 147; Garzarkiewicz v. Town of Kingsford Heights, 359 F.3d 933, 940 (7th Cir. 2004). Second, under *Pickering*, the Court balances "the interests of [the employee], as a citizen, in commenting upon matters of public concern, and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568.

#### 1. Policy Maker Exception

Defendants first contend that Jobe's speech falls outside the protection of the First Amendment because he was a policy maker. In Warzon v. Drew, 60 F.3d 1234, 1239 (7th Cir. 1995), the Seventh Circuit held that "the First Amendment does not prohibit the discharge of a policy-making employee when that individual has engaged in speech on a matter of public concern in a manner that is critical of superiors or their stated policies." Vargas-Harison v. Racine Unified School Dist., 272 F.3d 964, 972 (7th Cir. 2001), *citing*

<u>Warzon</u>, 60 F.3d at 1239.  Where the speaker is a policy maker, the <u>Pickering</u> analysis will regularly result in a finding that "the government employer's need for political allegiance from its policymaking employee outweighs the employee's freedom of expression to such a degree that it obviates <u>Pickering</u> balancing," and there is no need for a fact-specific analysis.  <u>Id.</u>

In this circuit, a policy maker is one whose position "authorizes, either directly or indirectly, meaningful input into governmental decisionmaking on issues where there is room for principled disagreement on goals or their implementation."  <u>Id.</u>, *citing* <u>Nekolny v. Painter</u>, 653 F.2d 1164, 1170 (7th Cir. 1981).  Courts must look behind labels and job titles to examine and evaluate the actual duties and responsibilities of the position.  <u>Id.</u>

Defendants argue that as the Chair of DBTS, Jobe was clearly a policy-maker; Jobe disputes this assertion.  The record before the Court, which is based primarily on Jobe's deposition testimony, reveals that in his role as Department Chair, Jobe was involved in the preparation of budgets to the extent of advocating for the allocation of funding, evaluated faculty for consideration for raises, utilized discretion to determine how amounts allocated for supply services and Indirect Cost Recovery funds were spent, interviewed candidates for secretarial and faculty positions, convened departmental meetings, participated in developing departmental policy through the amendment of departmental bylaws, oversaw up to 15 faculty members, was responsible for the organization of work in the department, participated in developing the department curriculum, and appointed members of the medical school curriculum committee.  Jobe also conceded that a regional dean and department chair should discuss topics such as "mechanisms by which teaching can be optimized, mechanisms whereby research and the discovery of new information for the

prevention and treatment of disease and suffering can come about.  The discussions need to include how funds will be obtained to make all of the good and wholesome goals of the institution, of the department and other departments, and help them thrive."  (Jobe Dep. Transcript at 52-53)

Although many of Jobe's answers to questions in this area appear to be deliberately oblique, Defendants have not cited any position description that could provide a more concrete delineation of Jobe's job duties and responsibilities in his position as Chair, leaving the Court with an issue of material fact that is not properly resolved on summary judgment.  Given the state of the record on this fact-based inquiry, the Court cannot exclude the possibility that a reasonable jury could find that Job was not a "policy maker" within the meaning of the exception.  Accordingly, Defendants are not entitled to summary judgment on this basis.

### 2. Matter of Public Concern

The question then becomes whether Jobe's speech addressed a matter of public concern.  When determining whether speech addresses a matter of public concern, the Court considers "the content, form, and context of a given statement, as revealed by the whole record." Cygan, 388 F.3d at 1099 (citing Connick, 461 U.S. at 147–48).  Of those three factors, content is the most important.  Id.  The Court may also consider the employee's choice of forum and motivation for speaking.  Id.  Ultimately, the Court must determine whether the speech is most accurately characterized as an employee grievance, or as a matter of political, social, or other concern to the community, such as "something that is a subject of legitimate news interest; that is, a subject of general interest and of

value and concern to the public at the time of publication." Id.; City of San Diego, California v. Roe, ___ U.S. ___, 125 S.Ct. 521, 525-26 (2004).

Having chosen to rely on the policy maker exception, Defendants did not initially make the alternative argument that Jobe's speech was not on a matter of public concern. If was not until their reply brief that Defendants asserted that the tenor of Jobe's speech revealed purely private interests and concerns about how the DBTS and UICOM-P should operate. The Court agrees.

Even when construed in the light most favorable to Jobe, the vague and non-specific assertions that have been offered in an attempt to define his "speech" amount to speech "criticizing budgetary decisions or infringements on faculty governance," "speech critical of Rager's violation of University statutes protecting faculty from harassment and coerced speech and also delegating to faculty the authority for hiring within their departments," and complaints "that Rager was abusing the office of regional dean by running roughshod over University procedures and ignoring DBTS' faculty involvement in decision-making." Such comments on their face are clearly indicative of a personal dispute or internal power struggle, and without citation to more detail evidencing precisely what was said, there is no basis for the Court to find that Jobe spoke about matters of public concern. Brooks v. University of Wisconsin Board of Regents, 406 F.3d 476, 479-80 (7th Cir. 2005), *citing* Michael v. St. Joseph County, 259 F.3d 842, 846-47 (7th Cir. 2001).

Furthermore, even if the vague descriptions of the speech were sufficient to permit further inquiry, the record indicates that Jobe's dispute with UICOM-P administration and Rager is best characterized as an ongoing, internal personal squabble and grievance. The Seventh Circuit has noted:

> While speech addressing matters of public protection and public safety are matters of public concern, we have cautioned that if every facet of internal operations within a governmental agency were of public concern, and therefore any employee complaint or comment upon such matters constitutionally protected, no escape from judicial oversight of every governmental activity down to the smallest minutia would be possible.

Kuchenreuther v. City of Milwaukee, 221 F.3d 967, 974–75 (7th Cir. 2000).

Here, Jobe spoke to express his opinion regarding decisions being made by Rager and other administrators and to comment on how these decisions affected the internal operation of the DBTS. As in Brooks, "the evidence does not suggest that the point of [Jobe's] speech was to raise a matter of public concern rather than to advance [his] purely private interests." Id. at 480; *citing* Metzger v. DaRosa, 367 F.3d 699, 702-03 (7th Cir. 2004); Colburn v. Trustees of Ind. Univ., 973 F.2d 581, 587 (7th Cir. 1992) (finding that where the overriding reason for the speech is the concerns of a few individuals whose careers may be on the line, the speech looks much more like an internal personal dispute than an effort to make the public aware of wrongdoing.) The dispute as to whether the DBTS should add additional faculty and expand research into cancer biology, hire Dr. Rao, and determine which areas should receive funding do not center on public welfare or attempt to "expose some malfeasance that would directly affect the community at large" so much as they reflect Jobe's desire to operate and run the DBTS as he saw fit and move the department in the direction that he favored. *See* Colburn v. Trustees of Indiana University, 973 F.2d 581, 586 (7th Cir. 1992). "This is a classic personnel struggle – infighting for control of a department – which is not a matter of public concern." Brooks, 406 F.3d at 480.

Accordingly, the Court finds that Jobe has failed to establish that whatever speech he made was entitled to constitutional protection, rendering the remainder of the <u>Pickering</u> analysis unnecessary. Defendants are therefore entitled to summary judgment on his First Amendment retaliation claim.

## II.    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

To state a claim for intentional infliction of emotional distress under Illinois common law, Jobe must allege that: (1) Defendants' conduct was extreme and outrageous; (2) Defendants intended to inflict severe emotional distress or knew there was a high probability that their conduct would cause severe emotional distress; and (3) Defendants' conduct did cause severe emotional distress. *See* <u>Van Stan v. Fancy Colours & Co.</u>, 125 F.3d 563, 567 (7th Cir. 1997); <u>Doe v. Calumet City</u>, 641 N.E.2d 498, 506 (Ill. 1994); <u>McGrath v. Fahey</u>, 533 N.E.2d 806, 809 (Ill. 1988). Conduct is extreme and outrageous only if "the conduct has been so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency . . . ." <u>Public Finance Corp. v. Davis</u>, 360 N.E.2d 765, 767 (Ill. 1976); <u>Kolegas v. Heftel Broad. Corp.</u>, 607 N.E.2d 201, 211 (Ill. 1992). Moreover, "as to the third prong, an action may lie 'only where the distress inflicted is so severe that no reasonable man could be expected to endure it.'" *See* <u>McNamara v. Guinn</u>, 2000 WL 1222128, at *3-4 (N.D.Ill. August 23, 2000), *citing* <u>McGrath</u>, 533 N.E.2d at 809.

Even when construed in the light most favorable to Jobe, the actions that he alleges were taken against him by Defendants do not rise to the level of "extreme and outrageous" conduct as a matter of law. In summary, Jobe complains that Defendants failed to reappoint him as Departmental Chair of DBTS, threatened him with termination, reassigned him to different office space, hired Dr. Rao, reassigned certain laboratory space, caused

him to lose his rat colony, and essentially forced him to retire early. While this conduct, if truly motivated by retaliatory animus, would certainly be inappropriate and reprehensible, Illinois court have set a particularly high threshold where the alleged emotional distress occurs in the employment context, as the workplace environment is particularly susceptible to personality conflicts, questioning of job performance, demotions, terminations, and other disciplinary actions. Van Stan, 125 F.3d at 567-69.

"'[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities' do not amount to extreme and outrageous conduct, nor does conduct 'characterized by malice or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.'" Id. at 567 (finding that terminating an employee known to have bipolar disorder, phoning him at home during vacation to inform him of his termination, and providing a false explanation for the termination was not enough to support an IIED claim); *see also*, Harriston v. Chicago Tribune Co., 992 F.2d 697, 703 (7th Cir. 1993) (finding that conduct was not extreme and outrageous where employer reprimanded plaintiff for no reason, refused to allow her to participate in a management incentive fund, forced her out of her management position, promised her a promotion that she never received, took away her major accounts, excluded her from office activities, monitored her telephone calls, and ignored concerns for her health and safety after her personal property was damaged on company property). In fact, courts have held that conduct by an employer that does not attempt to coerce a plaintiff into committing a crime or sexual misconduct fails to exceed the threshold necessary to establish the level of outrageousness necessary to maintain an IIED claim. Fang v. Village of Roselle, 1996 WL 386556, at \*\* 3-4 (N.D.Ill. July 5, 1996), *citing* Pavilon v. Kaferly, 561 N.E.2d 1245, 1251-52 (Ill.App.Ct.

199); Bailey v. Unocal Corp., 700 F.Supp. 396, 399 *N.D.Ill. 1988); Isaacson v. Keck, Mahin & Cate, 1993 WL 68079, at *8 (N.D.Ill. Mar. 10, 1993); Harriston, 992 F.2d at 703; Stoecklin v. Illinois Tool Works, Inc., 589 F.Supp. 139, 146 (N.D.Ill. 1984); Balark v. Ethicon, Inc., 575 F.Supp. 1227, 1232 (N.D.Ill. 1983).

Jobe has failed to demonstrate extreme and outrageous conduct by Defendants as a matter of law. As the Court finds that no reasonable jury could find in his favor on the record presented in this case, Defendants are entitled to summary judgment on Jobe's IIED claim.

## III.   TORTIOUS INTERFERENCE WITH BUSINESS ADVANTAGE

The elements of a tortious interference claim are undisputed. To maintain such a claim, the plaintiff must prove: (1) the existence of a valid business relationship or expectancy; (2) defendant's knowledge of that relationship or expectancy; (3) intentional interference inducing or causing a breach or termination of the relationship or expectance; and (4) damage resulting from the disruption. Mitsubishi Elec. Corp. v. IMS Technology, Inc., 1997 WL 630187 (N.D.Ill. Sept. 30, 1997), citing McIntosh v. Magna Sys., 529 F.Supp. 1185, 1193 (N.D.Ill. 1982). The third prong requires some kind of conduct by defendant directed toward a third party though which defendant purposely caused that party not to enter into or continue a prospective contractual relationship with the plaintiff. Id.; Westland v. Sero of New Haven, Inc., 601 F.Supp. 163, 166 (N.D.Ill. 1985); Mercury Skyline Yacht Charters v. The Dave Matthews Band, Inc., 2005 WL 3159680, at *9 (N.D.Ill. Nov. 22, 2005); Associated Underwriters of Am. Agency, Inc. v. McCarthy, 826 N.E.2d 1160, 1169 (Ill.App.Ct. 2005); Solaia Technology, LLC v. Specialty Pub. Co., 826 N.E.2d 1208 (Ill.App.Ct. 2005).

Here, Jobe argues that he had a reasonable expectancy of continuing his research and obtaining research grants from federal, state, and private agencies. However, he makes no attempt to identify or allege conduct directed by Defendants toward specific third parties through which Defendants purposely caused the third parties not to enter or continue with a prospective contractual relationship with him. Under the cases cited, this is fatal to Jobe's intentional interference claim, and Defendants are therefore entitled to summary judgment.

## CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment [#24] is GRANTED. This matter is now TERMINATED.

ENTERED this 10th day of January, 2006.

                                                s/ Michael M. Mihm  
                                                Michael M. Mihm  
                                                United States District Judge